Public Utilities Commission
No. 84-195

## APPEAL OF BOSTON AND MAINE CORPORATION
(New Hampshire Public Utilities Commission)

April 11, 1985

*Gallagher, Callahan & Gartrell P.A.*, of Concord (*James L. Kruse* on the brief), by brief for the petitioner.

*McNeill & Taylor P.A.*, of Dover (*John F. Dolan, Jr.*, on the brief), by brief for the respondent, the Town of Newmarket.

BATCHELDER, J.   The Boston & Maine Corporation (B&M) appeals a decision of the New Hampshire Public Utilities Commission (PUC) directing the repair and maintenance of a highway bridge in Newfields passing over the B&M's railroad track. Finding no error, we affirm the PUC decision.

B&M alleges in this appeal the following errors: (1) the Town of Newmarket had no standing to complain and the PUC had no authority to act under RSA 373:2, :3; (2) the PUC's finding of public inconvenience under RSA 373:22 did not give it authority to order reconstruction of the bridge; (3) the PUC did not lawfully or reasonably assess B&M with costs of reconstruction; and (4) B&M is entitled to a rehearing as a matter of law for the PUC's failure to grant or deny B&M's motion for rehearing within the ten days specified by RSA 541:5.

On November 28, 1983, the PUC opened Docket No. DX 83-366 on its own motion "to determine whether the public safety requires the closing of the [New Road] bridge or railroad, and whether the public good requires other or additional action regarding the crossing in question pursuant to RSA 373:22." The order was in response to a recommendation of the New Hampshire Department of Public Works and Highways, which observed structural damage to the bridge, and to the allegation of the Town of Newmarket that its residents would be seriously inconvenienced by a protracted closing of the bridge.

The PUC ordered representatives of the selectmen of Newfields and Newmarket, the commissioner of public works and highways and the director of the division of motor vehicles to sit in an advisory capacity pursuant to RSA 373:23 and ordered notice to all appropriate parties.

After a hearing on December 16, 1983, the PUC found that New Road leaves New Hampshire Highway No. 108 in Newmarket and proceeds southerly in a horseshoe fashion, returning to and termi-

nating at Route 108 in Newfields. The New Road bridge in question crosses over B&M tracks in Newfields, six feet away from the Newfields/Newmarket town line, and very near the southern terminus of New Road at Route 108.

The total distance between the terminal points of New Road by traveling along New Road is approximately 2.6 miles and by traveling along Route 108 is approximately 2 miles. The result of closing the bridge to traffic would be a cul-de-sac of 2.6 miles. The fifty or so persons living on or near New Road who seek to travel south would be required to travel northerly on New Road as much as 2.6 miles and then southerly the 2 miles south on Route 108, an extra distance of as much as 4.6 miles, to reach the point on Route 108 where New Road enters. Exeter, located to the south of New Road by way of Route 108, is the local center for doctors, hospitals, shopping and other interests.

The bridge in question serves no particular segment of Newfields. All the residents of the New Road area are in Newmarket. Newmarket took the position that Newfields or B&M should repair the bridge. Newfields took the position that it had no interest in the bridge and that the railroad should repair it. B&M alleged that Newfields owned the bridge and that, even though the railroad had maintained the bridge for the past one hundred years, it had no obligation to continue to do so.

The PUC found that the closing of the bridge adversely affected the traveling public and those requiring emergency attention. Also, maintenance crews and snow plows would have no place to turn their equipment. The PUC ordered B&M to repair the structural damage and to pay the estimated expense of $10,000 to $12,000. Newfields and Newmarket were ordered to maintain the road surface, with the cost apportioned equally between them.

B&M's first allegation of error is that the Town of Newmarket lacked standing to complain and the PUC lacked authority to act under RSA 373:2, :3. This argument misapprehends the procedural posture of the case.

The PUC opened Docket No. DX 83-366 "on its own motion to determine whether the public safety requires the closing of the bridge or railroad, and whether the public good requires other or additional action regarding the crossing in question pursuant to RSA 373:22." RSA 373:22 provides as follows:

"Whenever, after hearing upon petition or upon its own motion, the commission shall be of the opinion that the public safety requires the closing of any public or private crossing over a railroad at grade above or below such

railroad, it shall order the same to be closed or shall make such order as in its opinion the public good may require, and it shall thereafter be the duty of the parties affected to comply therewith."

The PUC's order of notice appropriately tracked the operative language of RSA 373:22. If the PUC were to make a threshold determination that the public safety requires the closing of a crossing, then RSA 373:22 empowers the PUC to make orders in the public good.

B&M does not dispute the foregoing analysis. Instead it argues that the PUC order in this case was, in essence, an order under RSA 373:2, :3, and that no petition under those sections was lawfully before the commission. RSA 373:2 provides in part as follows:

"Upon petition of a railroad, the commissioner of public works and highways, the selectmen of a town, or the mayor and council of a city, the commission, after notice and hearing, may require a railroad . . . (c) to reconstruct or otherwise alter or improve any existing bridge or underpass and the approaches thereto in instances where separation of grades has been effected . . . ."

RSA 373:3 provides in part as follows:

"Any order issued under RSA 373:2 shall provide for the apportionment of the cost . . . between the railroad and the municipality if such crossing is located at the intersection of a railroad and a highway other than [a state highway, trunk line or state-aided highway]."

B&M's position is that only RSA 373:2, :3, and not RSA 373:22, give the PUC the authority to order reconstruction and to apportion the costs between the municipality and the railroad. It argues that the Town of Newmarket was not authorized to petition under RSA 373:2 because, under RSA 373:3, Newmarket would bear no potential liability for costs. B&M further argues that RSA 373:2, :3 authorize only the municipality in which the road is located to petition.

We reject these contentions on two grounds. First, under RSA 373:22 the PUC has broad authority to order the crossing closed or to make "such order as in its opinion the public good may require." While this power may overlap at times with the PUC's power under RSA 373:2, :3 to order reconstruction and apportionment of costs, the two provisions are not inconsistent with one another.

Second, RSA 373:2, :3 do not restrict petitions by cities and towns to those cities and towns in which the crossing is located. The

statute contains no such restriction, although the legislature easily could have included one had it so desired.

Our interpretation is further borne out by the legislative history of RSA 373:2, :3. The predecessor of those statutes provided for a petition filed jointly by the proprietors of a railroad and either the selectmen of a town or the mayor and council of a city for needed reconstruction of overpasses or underpasses "located within such town or city." Laws 1937, 123:1; P.L. 249:48. Amendments to the statute in 1951 produced the statute in essentially its present form by deleting the requirement of a joint petition of the railroad and the municipality and by deleting the limitation of standing to the city or town in which the crossing was located. Laws 1951, 203:58; R.L. 299:2. We construe these statutory changes as evidence of a legislative intent to liberalize the procedures for initiating these petitions by eliminating the need for concurrence by the railroad and by expanding the pool of municipalities with sufficient interest in a crossing to initiate a petition.

B&M's second allegation of error is that the PUC made factual findings of public inconvenience, and that such findings are insufficient to meet the "public safety" threshold required to trigger the PUC's power under RSA 373:22 to make orders in the public good.

The PUC found that fifty or more people live on or near New Road and that many of these people's access to the south is best achieved across the bridge:

> "Their access to the south is more important than to the north because the hospital, doctors, shopping centers and other interests are reached from Route 108 to the south in the Exeter area. While they are all residents of Newmarket, their access to southern points is directly through Newfields. Since the closing of this bridge these residents are required to travel up to 2.6 miles to the north, then two miles to the south when their travel is to southern points, a maximum distance of approximately 4 1/2 miles."

PUC Report to Order No. 16,905, DX 83-366, at 3–4. The PUC further stated:

> "It is clear that the closing of the bridge adversely affects the traveling public and creates substantial additional mileage and time for those requiring emergency attention . . . . Maintenance vehicles of Newmarket and snow plows used to perform necessary highway work would have no place to turn their equipment."

*Id.* at 7.

In denying B&M's motion for rehearing, the PUC recounted the

above findings and specifically concluded that the public safety criterion was met:

"In the Report, the Commission clearly applied the public safety criteria [sic] wherein it found that the 'closing of the bridge . . . creates substantial additional mileage and time for those [residents of Newmarket] requiring emergency attention.'

We therefore reached the conclusion that the public safety of the residents of Newmarket requires that the bridge remain open."

Report to Supplemental Order No. 16,950, DX 83-366, at 2–3 (quoting Report to Order No. 16,905, DX 83-366, at 7).

On the basis of these findings, the PUC properly made the threshold determination of risk to public safety sufficient to proceed under RSA 373:22 to make orders in the public good.

B&M's further argument that the PUC's power to proceed in the public good under RSA 373:22 is limited to closing a crossing, subject only to a proceeding initiated under RSA 373:2 for reconstruction, is not suggested by the statutory framework. In this case, the PUC, in formulating its orders in the public good, properly relied upon RSA 373:2, :3 for guidance in resolving the questions about proper notice, parties, advisory committee and cost apportionment. This approach to resolving these issues was entirely consistent with the statutory mandate and, on the record before us, yielded no unfair surprise or prejudice to B&M.

B&M's third allegation of error is that the PUC did not lawfully or reasonably assess B&M with costs of reconstruction. It argues, first, that B&M's due process rights to notice of a cost apportionment proceeding were violated and, second, that the facts before the PUC did not warrant the apportionment ordered. We do not decide this issue because it was not properly preserved for appeal.

In its motion for rehearing, B&M alleged "the ordered apportionment of costs is not consistent with RSA 373:3." Newmarket objected that the allegation failed to specify the manner in which the ordered apportionment is inconsistent with RSA 373:3. Upon appeal, this court ordered the issues on appeal limited to those raised in B&M's motion for rehearing. *See* RSA 541:4.

On the record before us, we conclude that B&M failed to specify adequately in its motion for rehearing to the PUC the third ground alleged as error in this appeal.

B&M's fourth allegation is that it is entitled to a rehearing as a matter of law because the PUC did not act on B&M's motion for

rehearing within ten days, but instead took more than thirty days. *See* RSA 541:5. In its brief, B&M alleges material prejudice as a result of this failure solely "because of the procedural and substantive irregularities described earlier to which it was subjected by the Commission."

 This vague allegation fails to show any prejudice flowing from the alleged error. Accordingly, it is denied. *See Appeal of Concord Natural Gas Corp.*, 121 N.H. 685, 690–91, 433 A.2d 1291, 1295–96 (1981).

Finding no error among the four grounds alleged, we affirm the PUC decision.

*Affirmed.*

All concurred.